**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA**

ERICSON P. KIMBEL,                    CIVIL DIVISION

                Plaintiff,          No.   **2:24-cv-134**

     v.

FROST BROWN TODD, LLP,

               Defendant.     **JURY TRIAL DEMANDED**

<u>**COMPLAINT**</u>

AND NOW, comes Plaintiff Ericson P. Kimbel by and through counsel Robert A. Bracken, Esquire and Bracken Law Firm, LLC and files the following Complaint and avers as follows:

<u>**PARTIES AND JURISDICTION**</u>

1.     Plaintiff, Ericson P. Kimbel ("Eric Kimbel"), is a resident of the Commonwealth of Pennsylvania, residing in Allegheny County, Pennsylvania.

2.     Defendant, Frost Brown Todd, LLP ("FBT") is a limited liability partnership with its principal place of business located at 301 East Fourth Street, Suite 3300, Cincinnati, OH 45202.

3.     Plaintiff brings this action under the Americans with Disabilities Act, 42 U.S.C. 12101, *et seq.*, to secure all relief as may be appropriate and available.

4.     Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). The filing also constituted an initiation of proceedings with the Pennsylvania Human Relations Commission pursuant to and by operation of the work sharing agreement between the EEOC and that agency.  At the

appropriate time, Plaintiff will amend this Complaint to assert claims under the Pennsylvania Human Relations Act against FBT as well several individuals.

5.      Plaintiff was issued a Notice of Right to Sue from the EEOC, which was sent to Plaintiff on November 8, 2023. A copy of the Notice is attached as Exhibit 1.

6.      The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331, as well as 28 U.S.C. § 1367 for Plaintiff's pendent tort claim.

7.      Venue is appropriate in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this Complaint occurred in Allegheny County, Pennsylvania.

## FACTUAL ALLEGATIONS

8.      Eric Kimbel is an attorney licensed to practice law in Pennsylvania, Texas, and West Virginia specializing in construction, energy, and federal government contract law and handling both transactional and litigation matters in these and other areas.

9.      Kimbel graduated from the University of Pittsburgh with a joint JD and Masters of Public and International Affairs and has practiced in Pittsburgh throughout his career at firms like Reed Smith, Saul Ewing, Leech Tishman and others.

### Kimbel's Exceptional Performance at FBT Despite Inadequate Resources

10.     In September 2018, Kimbel joined FBT as a non-equity partner and was referred to as a partner.

11.     Kimbel excelled at FBT, as he generated millions of dollars in attorney's fees for the law firm, and originated significant work for himself and his partners in the firm, including having FBT placed on Panel Counsel for a Fortune 100 client ("Client A") that transferred to FBT when Kimbel joined.

12.     Kimbel succeeded despite FBT continuously refusing to support his practice and provide the necessary associate and staff support required, as promised when Kimbel joined the firm.

13.     For example, despite the devastating effects of COVID-19 on the market, Kimbel **collected** the following revenue for FBT in 2020:

|   |   |   |
|---|---|---|
| a. | Origination | $1,080,000.00 |
| b. | Development | $    74,000.00 |
| c. | Working | $  603,000.00 |

**Total Revenue collected by Kimbel for FBT in 2020        $1,757,000.00**

14.     Likewise, despite battling pneumonia for a period of weeks in 2021, Kimbel **collected** the following annual revenue for FBT:

|   |   |   |
|---|---|---|
| a. | Origination | $1,249,853.00 |
| b. | Development | $298,000.00 |
| c. | Working | $703,000.00 |

**Total Revenue Collected by Kimbel for FBT in 2021        $2,201,000.00**

15.     Kimbel did not work all these hours as the origination collected by Kimbel includes others' working hours on Kimbel's clients and some of Kimbel's working hours.

16.      FBT's Profit Synopsis does not include the administrative hours spent working on firm matters, which are recorded in FBT's time system.

17.     Kimbel was forced to work an excessive number of administrative hours due to the lack of support for his practice.

18.     The level of administrative time expended by Kimbel was increasingly serious and Kimbel regularly raised the lack of administrative support to management.

19.     FBT management also agreed that Kimbel needed a construction associate in Pittsburgh, yet refused to provide Kimbel with the necessary support.

### *Kimbel's Disabilities Substantially Impair Major Life Activities*

20.     At various times from 2022 to the present, Kimbel has suffered with disabilities including Lyme disease, anxiety, sleep apnea and bouts of COVID-19 with significant, long-lasting effects.

21.     Moreover, prior to starting at FBT, Kimbel had a history of hypertension and had a coronary artery stent inserted, which was made known to FBT, placing him in a higher-risk category.

22.     When active, Kimbel's disabilities substantially impaired his activities of daily living including the ability to breathe, sleep, concentrate, and work.

23.     In January, February and then, again, in late April and into May 2022, Kimbel contracted COVID-19.

24.     During and after his first and second bouts with COVID in January and February 2022, Kimbel was experiencing tightness in his chest, high blood pressure, an inability to sleep, general fatigue, nervousness, loss of appetite, and other COVID-19-related symptoms.

25.     Kimbel was unable to eat regularly in January and February and began losing weight at that time.

26.     Kimbel also could not attend the 2022 Firm Retreat because of his illnesses.

27.     In April 2022, Kimbel was diagnosed with anxiety and began receiving treatment due to various stress factors.

4

28.     The most stressing factor at that time was lack of support at FBT and the pending six (6) trials Kimbel had scheduled for 2022 with minimal, non-construction associate assistance.

29.     Kimbel contracted COVID-19 again in the April-May timeframe.

30.     This bout of COVID-19 included similar adverse effects as described above as well as heavy sinus drainage and sore throat which contributed to further weight loss, fatigue, and an even greater inability to sleep.

31.     At this point, Kimbel was unable to properly focus and work for more than a few hours at a time, so he would do shift-like work (work for a few hours, sleep for a few hours, and repeat) to maintain client needs, prepare filings, address all the administrative duties imposed upon him by management, and other tasks for FBT and his clients.

32.     In September 2022, Kimbel began treating for Lyme Disease and was prescribed doxycycline.

33.     Kimbel followed up with his primary care physician in October 2022 with the same concerns of rash, tenderness, fatigue, large joint pain, and muscle aches, and was again prescribed doxycycline.

34.     As the rash, fatigue, aches, and pain continued, Kimbel went to the McCandless AHN Hospital on November 3, 2022.

35.     Lyme disease was confirmed and Kimbel was placed on a 21-day course of amoxicillin, and experienced stomach problems, additional lethargy and fatigue, and loss of appetite due to the antibiotic.

36.   The effects of the disease on Kimbel have been quite devastating and erratic.

37.   Kimbel continues to suffer with Lyme disease, despite multiple treatments in 2022 and 2023, and its effects have included, but are not limited to the following:

  a.  Partial facial paralysis;

  b.  Fatigue;

  c.  Loss of Weight;

  d.  Muscle Aches and Stiffness;

  e.  Insomnia;

  f.  Nerve Pain;

  g.  Intermittent Numbness in Extremities; and

  h.  Large Joint Pain.

38.   Between April 21, 2022 and November 18, 2022, Kimbel was forced to miss more than 150 hours of work due to COVID-19 and Lyme disease.

39.   Nevertheless, even while he was suffering from active disabilities, Kimbel had no choice but to continue to perform client work as much as he could due to the lack of construction associate support, lack of other support, and his trial schedule while also being forced to spend over one thousand (1000) hours of recorded administrative time in 2022.

40.   Despite the extensive health problems caused by his disabilities and more than 150 recorded sick hours and the more than 1000 hours of administrative time, Kimbel still **collected** the following revenue for FBT in 2022:

  a.  Origination                                    $798,100.00

b.  Development                                          $0.00

c.  Working                                        $518,754.00

**Total Revenue Collected by Kimbel for FBT in 2022     $1,316,854.00**

***FBT Takes Adverse Action Against Kimbel After He Reports his Disabilities***

41.     Kimbel discussed the Lyme disease and/or COVID-19 diagnoses and the impact they were having on his health, his billable hours, and his practice during 2022 many times with several FBT equity partners, non-equity partners and other employees, including Adam Hall, Chief Executive Officer, Theresa A. Canaday, Litigation Department Chair, Jordan Blask, Pittsburgh Office Partner-in-Charge, Claudine Matthews, Office Administrator, Peter Cummins, Business Litigation Practice Group Leader & Recruiting Committee Chair, John Higgins, Construction Litigation Practice Group Leader, Terry Brookie, former Construction Litigation Practice Group Leader, among many other partners and staff.

42.     In July 2022, Canaday and Kimbel spoke by phone at her request.

43.     Canaday informed Kimbel that management would not nominate him for equity vote.

44.     Canaday stated that she and management had decided not to nominate Kimbel because of his low hours in 2022.

45.     Kimbel explained in detail to Canaday that he had COVID-19 at least three times since January that year and the impact those infections had on his health and his practice.

46.     Kimbel noted that he had provided email notices to Claudine Matthews, the Pittsburgh Office Manager, about his COVID-19 diagnoses, had recorded sick time

hours in the time entry system for those sick days taken due to COVID-19, and had constant emails and communications with various clients and FBT attorneys and staff regarding his COVID-19 infections; thus, his battle with COVID-19 in 2022 was well-known.

47.     Kimbel also explained that he was forced to spend hundreds of hours performing administrative work and tasks, all of which were nonbillable and were in the time system.

48.     Canaday stated that the non-billable hours and sick time would not be counted towards the evaluation of Kimbel's hours; thus, instead, those were held against Kimbel.

49.     Kimbel explained that he and his wife were actually very fortunate that they had suffered from COVID-19 and had needed medical care, as it led to his wife's cancer being diagnosed earlier than it otherwise would have been, which diagnosis had, literally, been confirmed earlier that same day.

50.     Canaday expressed sympathy about the cancer diagnosis, yet proceeded to chastise Kimbel more because of his low hours and state that he would not be put up for a vote to become an equity partner as a result.

51.     Kimbel reiterated that the only reason the hours were down was that he was sick, and that his hours on firm matters were still substantial due to the administrative duties that had been placed on him.

52.     He also stated, again, that he needed associate and secretarial support to support his practice, his clients, and other partners' clients.

53.     Canaday stated that she would not provide Kimbel any assistance and, Kimbel demanded financial data to support the contention that such assistance could not be provided.

54.     Canaday ended the conversation with the demand that Kimbel increase his hours and that he personally enter his own time more frequently.

55.     Canaday did not express any concern for Kimbel's health, offer any form of assistance or accommodation whatsoever, and ended the call.

56.     On December 29, 2022, Kimbel met with Hall for his annual evaluation.

57.     By this time, Kimbel had contracted Lyme disease, and treated for it multiple times.

58.     During the evaluation meeting, Hall indicated that an "adjustment" to Kimbel's salary needed to be made because his hours were low.

59.     Kimbel stated that his hours were down due to COVID-19 and Lyme disease, and the disabling effects both had upon his health and his performance in 2022.

60.     Despite that, Hall stated that FBT was cutting Kimbel's salary by $50,000 because his hours were low.

61.     Kimbel reiterated that the hours were only down because of the consequences of the disabilities from which he suffered, specifically Lyme disease and COVID-19, and further stated that he had outrageous administrative hours which had been an ongoing issue with no remedy.

62.     Nevertheless, Hall repeated that FBT was going to cut Kimbel's salary.

63.     Kimbel told Hall that his and FBT's actions were discriminatory and in violation of the law.

64.     Hall responded: "They wanted me to cut you more, but I am only cutting you $50,000 based on what you just told me."

65.     Thereafter, on various occasions, Kimbel complained about FBT's discriminatory decision to cut his pay, including to Blask in or about February 2023.

66.     On March 15, 2023, Kimbel sent an email to Robert Sartin, Chairman and copied Hall, Canaday, and Charles Pritchett, FBT's General Counsel.

67.     In the email, Kimbel raised numerous issues regarding FBT's lack of support, discrimination, and the loss of substantial firm revenue, in excess of $650,000.00 in 2022, due to Kimbel being forced to handle administrative tasks, among other topics.

68.     Kimbel described in detail and with support the harm to his practice, his clients, his development network, and the firm's revenue caused by FBT's failure to support his practice and clients' work.

69.     Kimbel described the refusal to reimburse him for business expenses incurred in September 2022.

70.     And, Kimbel stated in his email to Sartin that FBT had discriminated against him by its decision to cut his pay because he had missed about 22 weeks of work in 2022 due to Lyme Disease and COVID-19.

71.     On March 16, 2023, Kimbel met with Sartin to address the issues in his March 15 email.

72.     Sartin's first question to Kimbel was "do you want us to package you up?"

73.     Kimbel did not understand the question so he asked for clarification on what Sartin meant.

74.     Sartin said "package you up, you know, so you can leave?"

75.     It was clear in that meeting that FBT wanted Kimbel to resign.

76.     Kimbel's response was that he would not be at the firm if he did not want to be, so no he did not want to be packaged up.

77.     During the meeting, Sartin discussed several matters, including some of the issues raised in Kimbel's March 15 email.

78.     Sartin stated several more times that FBT could "package you up" to help Kimbel move onto another firm; Kimbel declined those repeated offers.

79.     Sartin also repeatedly asked if Kimbel had submitted a disability claim due to his sicknesses.

80.     Kimbel responded that he could not take disability because there was no one available at FBT to help Kimbel, let alone do all his work.

81.     Kimbel directly asked Sartin for secretarial, paralegal, and construction associate help in Pittsburgh, which was a request for a reasonable accommodation.

82.     At the end of the meeting Sartin said he would provide Kimbel with construction associate and secretarial help, and stated that someone would call Kimbel within six (6) hours.

83.     No one called Kimbel in six (6) hours and no associate help was provided; in fact, FBT management removed the minimal associate support Kimbel did have within a few weeks of the meeting with Sartin.

84.     On or about April 4, 2023, Kimbel had a meeting with Canaday, Blask, and Jeffrey Lindeman, FBT's Labor and Employment Law Practice Group Leader, at Canaday's insistence who appeared remotely.

85.     Blask was also remote and Lindemann and Kimbel were the only people physically in the Pittsburgh office for the meeting.

86.     Canaday demanded that Kimbel meet with her at this time even though she was supposedly on the way to the airport, had a bad connection, could not hear at times, and could not be heard much of the time during the meeting.

87.     Despite fact that Canaday said she had only 30 minutes, and repeatedly stated she needed to go to the airport during the meeting, to which Kimbel said please leave when you need to, she stayed on the call for more than an hour.

88.     Additionally, Blask was literally on the beach and could rarely hear or be heard due to the wind and background noises.

89.     Blask had informed Kimbel prior to the meeting that the purpose was for it to be a "fix-it" meeting to address the issues he had raised with Sartin, including complaints of discrimination.

90.     Canaday, however, had a completely different agenda to discuss which had nothing to do with the issues Kimbel had raised in his email and meeting with Sartin.

91.     Kimbel responded by stating that they needed to discuss the issues that he had raised and that was why the meeting was occurring.

92.     Canaday chose to continue with her agenda and attempted to ignore Kimbel's request to address his issues.

93.     However, during the meeting and in response to Kimbel's questioning regarding discrimination, Canaday first claimed she did not recall whether Kimbel told her about his COVID-19 diagnosis in July 2022.

94.     Later, during the same meeting and after several more questions by Kimbel, Canady claimed that Kimbel had never told her or the firm anything about his COVID-19 diagnoses prior to the July 2022 call.

95.     Kimbel pointed out the one-hundred-plus hours of sick time in the time system as of June 2022, yet Canaday said that was not notice.

96.     Kimbel pointed out the email to Matthews and the many other emails discussing his COVID-19 infections, yet Canaday said that was not notice either.

97.     Kimbel pointed out that he had discussed his medical conditions extensively with management prior to the 2022 annual evaluation, including with Canady and even during the evaluation with Hall, yet Canaday said that also was not notice of the disabilities.

98.     Canaday kept repeating during the meeting that FBT did not discriminate against Kimbel because FBT did not have notice of his COVID-19 diagnoses and Lyme Disease, with which Kimbel disagreed each and every time.

99.     Canaday then questioned Lindeman if he thought there was discrimination; however, Lindeman would not respond to that question, even when Canaday had asked him directly four times.

100.     Canaday stated during the meeting that while FBT would provide Kimbel with a few hours of receptionist support to help enter his time (after FBT had first trained the receptionist to enter time), FBT would not provide the associate, paralegal, or secretarial/legal practice assistance support requested and required for his practice and clients.

101. Kimbel objected repeatedly to FBT's refusal to accommodate his justified and necessary requests.

102. After the March and April meetings, Kimbel's nightly level of sleep greatly decreased, and his fatigue increased; thus, he sought medical attention.

103. The anxiety with which Kimbel was diagnosed in April 2022 had increased and his medical treatment has doubled.

104. Kimbel was also treated for insomnia at that time because he was unable to sleep more than 3-4 hours a night.

105. Treatments for anxiety and insomnia had minimal effect given the continued retaliation by FBT and its daily efforts to dismantle Kimbel's practice, reputation, and income.

106. Rather than support Kimbel after he engaged in protected activity and attempted to resolve the lack of support, discrimination, and other impacts FBT's actions and decisions were having upon Kimbel and his practice, FBT engaged in a pattern of retaliation that is still continuing.

107. FBT attempted to implement arbitrary rules, such as requiring that Kimbel's time be entered every single day, despite no such requirement prior to his March email to Sartin, which was protected activity.

108. FBT also continued to refuse to support Eric Kimbel's practice and development efforts.

109. FBT, Canaday and John Higgins refused to reimburse Kimbel expenses for travel and development work performed for FBT totaling $5,200.00.

110.    On June 8, 2023, after Kimbel had received no response to multiple requests to management for reimbursement, data, meetings, and information, nor from Kristen Hibbard, Chief Human Resources Officer, one of two EEOC Officers at the firm, Kimbel sent an email to Sartin, Lindemann, Pritchett, Hibbard, and Matthew Blickensderfer, FBT's Assistant General Counsel and copied Hall, Canaday and Blask.

111.    In his June 8, 2023 email, Kimbel described his disabilities, reported instances of discrimination and retaliation, and requested accommodations.

112.    None of the FBT partners and employees that received Kimbel's email contacted him to discuss his accommodation requests or even expressed the slightest concern regarding his disabilities, including at that time, partial facial paralysis due to a recurrence of Lyme disease.

113.    Kimbel repeatedly attempted to contact Hibbard, one of FBT's two EEOC officers, yet she refused to respond to him on any of the issues raised in his June 8, 2023 email, or the EEOC issues that have been raised by Kimbel since 2022.

### FBT Terminates Kimbel's Employment and Continues to Retaliate Against Him

114.    On June 13, 2023, Hall sent Kimbel a letter terminating his employment effective June 30, 2023.

115.    The actions of Hall and FBT in terminating Eric Kimbel's employment were retaliatory and a continuation of the ongoing discrimination against Kimbel.

116.    FBT's reasons for terminating Kimbel are pretext.

117.    FBT's retaliation, through the conduct of its officers and partners, towards Kimbel has been extensive, is continuing in nature, and is merely summarized in the following paragraphs.

118.    FBT blocked email communications from Kimbel to certain of his clients, including those involved in active litigation, while Kimbel was still employed.

119.    FBT blocked those email communications without providing Kimbel advance notice.

120.    In 2023, FBT removed the minimal associate support Kimbel had received prior to that time.

121.    FBT did not provide Kimbel with the data to support its reasoning for denying Kimbel's accommodation requests.

122.    FBT removed other partners' work from Kimbel without basis.

123.    FBT did not provide client revenue reports to Kimbel.

124.    FBT refused to provide information regarding his client, Client A, upon request.

125.    FBT blocked Kimbel's emails to his personal email address and to any addresses that FBT did not pre-approve.

126.    FBT's EEOC Officers did not respond to Kimbel's multiple and repeated protected activities and requests for assistance.

127.    FBT closed certain matters to prevent Kimbel from entering his time in 2023.

128.    FBT refused to reimburse Kimbel's business expenses.

129.    FBT refused to support Kimbel's business development efforts in 2023.

130.    FBT removed business development budget from Kimbel for 2023.

131.    FBT wrote off certain of Kimbel's billable time in 2022 and 2023.

132.    FBT permitted certain partners to bill Kimbel's work at almost half of his effective rate.

133.    FBT made false statements regarding Kimbel's July 2022 discussion with Canaday.

134.    FBT made false statements regarding Kimbel's December 2022 discussion with Hall.

135.     FBT refused to provide the necessary and requested associate, paralegal and administrative support to Kimbel.

136.    FBT falsified the content of an email chain by deleting selected emails from the chain and then forwarding the altered chain.

137.    FBT demanded that Kimbel provide information related to client matters that had never been requested prior to engaging in protected activity and refused to identify the custom, policy or practice that supported such a request.

138.    FBT refused to provide Kimbel with the accommodations requested.

139.    FBT refused to engage in the interactive process.

140.    FBT falsely claimed that Kimbel did not request an accommodation or put FBT on notice of his disability.

141.    FBT refused to approve a business trip necessary for Kimbel to complete work for a client.

142.    FBT billed Kimbel's clients without his prior review and approval of the bills.

143.    FBT refused to provide Kimbel with a parking pass.

144.    FBT refused to provide adequate assistance to Kimbel for the entry of his billable time.

145.    FBT demanded that Kimbel enter his time daily even though he was not supposed to be spending his billable time entering time.

146.    FBT refused to acknowledge or investigate Kimbel's complaints of discrimination and retaliation.

147.    FBT refused to refused to provide anonymized comparative data to show how Kimbel performed in relation to his similarly situated partners, and equity partners.

148.    FBT provided origination credit and money to which Kimbel was entitled to other FBT partners.

149.    FBT refused to provide Kimbel with reports detailing the revenue generated by clients that Kimbel had originated.

150.    FBT issued a unilateral transition letter to Kimbel's clients after agreement was reached to issue a dual signature transition letter.

151.    FBT sent at least two different out-of-office replies to clients and others sending emails to Kimbel at his fbtlaw.com email address.

152.    FBT refused to send transition letters to certain of Kimbel's clients.

153.    FBT delayed the transition of and/or failed to turn over client-related files and materials.

154.    FBT delayed the transition of and/or failed to return Kimbel's personal property, including a hard-drive containing several years' worth of Kimbel's work product.

155.    FBT scanned and/or reviewed Kimbel's personal property, including his personal hard drive despite Kimbel's prior objection.

156.    FBT sent bills to clients that transitioned to Kimbel and away from FBT without Kimbel's approval and with improper charges.

157.    FBT refused to timely provide FBT's fee statements and account information to Kimbel for use in an AAA hearing for a former client of FBT that transferred to Kimbel, when FBT had notice of the hearing date and had received multiple requests for that information to be used at the hearing.

158.    FBT refused and continues to refuse to provide Kimbel access to his FBT emails to obtain information and work product necessary to represent former FBT clients that have transferred to Kimbel.

159.    FBT defamed and disparaged Kimbel regarding numerous matters, including his disabilities, his client relationships, his job performance, and the reasons he was terminated.

160.    FBT's retaliatory conduct, which is still continuing, was designed to hinder Eric Kimbel's ability to provide legal services to his clients and prospective clients, and to injure those clients that transferred with Kimbel.

## COUNT I – DISABILITY DISCRIMINATION

161.    Plaintiff incorporates Paragraphs 1 through 160 as if fully set forth at length herein.

162.    This claim is brought pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq.

163.    At all relevant times, Defendant was an "Employer" as defined in 42 U.S.C. § 12111(5).

164.    At all relevant times, Plaintiff was an "Employee" as defined in 42 U.S.C. § 12111(4).

165.    Plaintiff suffered from disabilities as defined in 42 U.S.C. § 12102(1).

166.    Plaintiff suffered from physical impairments that limited one or more of his life activities as defined in 42 U.S.C. § 12102(2)(a).

167.    Plaintiff has a record of such impairment and was regarded as having such an impairment by Defendant.

168.    Defendant knew of Plaintiff's disabilities and knew of Plaintiff's request for accommodations, which Defendant failed to appropriately provide.

169.    Defendant had an obligation to engage in an individualized interactive process, yet failed to do so.

170.    Defendant engaged in discriminatory, prohibited conduct when it failed to provide Plaintiff an accommodation, failed to engage in a legitimate interactive process, failed to promote him, decreased his pay, and terminated his employment.

171.    Defendant's conduct violated 42 U.S.C. § 12112(a) and (b).

172.    As a direct and proximate result of Defendant's unlawful, willful, deliberate discrimination against Plaintiff, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to his reputation, adverse effects on his career, emotional distress, anxiety, and diminished earning capacity.

173.   As a result of Defendant's discriminatory conduct, Plaintiff is entitled to all available damages pursuant to the Americans with Disabilities Act, including but not limited to damages for the following: (1) all available compensatory damages; (2) economic and non-economic losses; (3) equitable relief including employment, reinstatement, and promotion; (4) attorneys' fees and costs; and (5) punitive damages.

WHEREFORE, Plaintiff demands all available damages against Defendant plus interest, attorney's fees, costs, punitive damages, and any other damages deemed proper.

## COUNT II – UNLAWFUL RETALIATION

174.   Plaintiff incorporates by reference herein Paragraphs 1 through 173 of the Complaint as if more fully set forth at length herein.

175.   Defendant's conduct described above and herein constitutes retaliation, in violation of the law.

176.   Specifically, Defendant's retaliatory conduct violates all statutes and laws under which Plaintiff has brought claims, including the Americans with Disabilities Act.

177.   Defendant's retaliation against Plaintiff was based on his disability and/or perceived or record of disability, his requests for accommodations and/or his good faith complaints.

178.   As a direct and proximate result of Defendant's unlawful, willful, deliberate retaliation against Plaintiff, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to his reputation, adverse effects on his career and diminished earning capacity.

179.   As a result of Defendant's retaliatory conduct, Plaintiff is entitled to all available damages, including but not limited to damages for the following: (1) all

available compensatory damages; (2) economic and non-economic losses; (3) equitable relief including employment, reinstatement, and promotion; (4) attorneys' fees and costs; and (5) punitive damages.

WHEREFORE, Plaintiff demands all available damages against Defendant plus interest, attorney's fees, costs, punitive damages, and any other damages deemed proper.

## COUNT III – INTENTIONAL INTERFERENCE WITH EXISTING AND PROSPECTIVE ECONOMIC ADVANTAGE

180.    Kimbel incorporates by reference herein Paragraphs 1 through 179 of the Complaint as if more fully set forth at length herein.

181.    Kimbel had existing contractual relations with clients he brought to the firm and with those he generated at the firm.

182.    FBT was fully aware of these relationships as it greatly benefited from Kimbel's relationships while he was employed and continue to benefit from those clients Kimbel brought to the firm who have not transferred to Kimbel yet.

183.    FBT also knew of Kimbel's prospective relationships through Kimbel's business development plans and marketing information FBT demanded every year from Kimbel, and from a monthly report Kimbel was mandated to provide regarding his business development activities and other matters.

184.    FBT was also aware that clients transferred from FBT to Kimbel after Kimbel was terminated having received executed client transfer letters transferring the client and their matters to Kimbel for further handling.

185.    FBT has refused to provide Kimbel with any of the communications by FBT to other of Kimbel's clients that he brought to the firm regarding Kimbel's

termination, transfer of their matters and account to Kimbel, Kimbel's new contact information, or any other information regarding Kimbel.

186.    With regard to all of Kimbel's clients, FBT acted with the intent to harm Kimbel by interfering with those existing and prospective relationships in at least the following ways:

      a.  Sending unapproved letters to clients rather than the agreed upon dual signature letters; and

      b.  Unilaterally deciding which of Kimbel's clients that would be sent transition letters rather than sending the letters to all of Kimbel's clients.

187.    With regard to certain of Kimbel's clients, those who transferred with Kimbel after termination, FBT acted with the intent to harm Kimbel by interfering with those relationships in the following ways:

      a.  Improperly billing some of Kimbel's clients;

      b.  With regard to one client, repeatedly demanding payment for the same improper invoice at higher and higher levels of management and in different departments, all of whom denied payment because the work was not completed;

      c.  Refusing to provide copies of all of FBT's communications to and with Kimbel's clients, after they had transferred to Kimbel;

      d.  Failure to and refusal to copy Kimbel on correspondence to Kimbel's clients;

e.   Refusing to cease and desist, upon written demand to cease and desist, improper billing of Kimbel's clients;

f.   Refusing to provide all client materials for clients that transferred to Kimbel, despite multiple written demands;

g.   Providing partial sets of client materials in active litigation matters with misrepresentation that they were complete record sets;

h.   Misrepresenting to clients, prospective clients, and others the reason Kimbel is no longer with FBT;

i.   Threatening Kimbel's clients with collections measures for improperly billed, uncompleted work;

j.   Demanding that Kimbel provide individual email addresses for each of the clients, parties, counsel, witnesses, interviewees, experts, and others involved in litigation matters, without providing reference to the email system or allowing Kimbel to review his emails, in order for FBT to transfer client emails to Kimbel; and

k.   Taking actions, including but not limited to disparaging and/or defaming Kimbel with the intent of interfering with his contractual and prospective client relations.

188.   FBT knew that the interference was certain or substantially certain to occur because of the foregoing and other actions and/or omissions.

189.   Kimbel has been damaged as a result.

190.   FBT's actions were intentional and/or performed with reckless indifference to the rights of Plaintiff.

191.     Accordingly, punitive damages are warranted.

WHEREFORE, Plaintiff demands all available damages against Defendant plus interest, costs, punitive damages, and any other damages deemed proper.

## PENNSYLVANIA HUMAN RELATIONS ACT

192.     Plaintiff incorporates by reference herein Paragraphs 1 through 191 of the Complaint as if more fully set forth at length herein.

193.     Plaintiff intends to assert an additional cause of action.

194.     Plaintiff will request leave to amend to bring a cause of action under the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. against FBT and certain employes or officers of FBT, to secure full restitution of all wages and benefits resulting from their violations of the Pennsylvania Human Relations Act and for such other and further relief as may be appropriate upon the exhaustion of administrative remedies to the extent that the PHRA claims are not resolved before the PHRC.

195.     Jurisdiction of this action will be based on the principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

196.     Plaintiff's filings with the EEOC constituted an initiation of proceedings with the Pennsylvania Human Relations Commission pursuant to and by operation of the work sharing agreement between the EEOC and that agency.

197.     Accordingly, Plaintiff will move to amend the complaint to affirmatively assert PHRA claims upon the exhaustion of administrative remedies.

**JURY TRIAL DEMANDED**

**BRACKEN LAW FIRM, LLC**

By _____
Robert A. Bracken
707 Grant Street
Gulf Tower, Suite 1705
Pittsburgh, PA 15219
*Counsel for Plaintiff*